[Civ. No. 10879. Third Dist. Nov. 4, 1964.]

RALPH KINGSTON, Plaintiff and Appellant, v. BOARD
OF SUPERVISORS OF THE COUNTY OF EL
DORADO et al., Defendants and Respondents.

Ralph E. Kingston, in pro. per., for Plaintiff and Appellant.

Jack R. Winkler, District Attorney, for Defendants and Respondents.

VAN DYKE, J.†—This is an appeal from an order discharging an alternative writ of mandate and denying a peremptory writ. On December 2, 1963, petitioner in the trial court, appellant here, filed his petition for a writ of mandate asking that the Board of Supervisors of El Dorado County, respondents here, be commanded to proceed forthwith to

---

†Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

realign the supervisorial districts of the county so as to make them as nearly equal in population as possible.

The petition alleged that although by section 25001 et seq. of the Government Code boards of supervisors in the several counties were required from time to time to equalize such districts in respect of population, yet a great imbalance had long existed in El Dorado County, and the board had refused to comply with the law. The answer to the petition, while admitting that petitioner had requested a revision of district boundaries and had been told by the supervisors that they would not comply with this request, nevertheless denied that there was, or that there had been, a great inequality in the population of the existing districts, and denied that the board had refused or failed to redistrict in accordance with the law. The answer further alleged that, admitting some inequality existed, the same was warranted by the factors of topography, geography, cohesiveness, contiguity, integrity, compactness of territory and community of interests of the districts.

The record shows that the cause came to trial; that one Bruce Robinson, who had acted as Planning Director of El Dorado County, had been called by the respondent board, sworn and examined and that the matter had been submitted. The record further shows that the trial judge assigned to hear the cause had filed a memorandum opinion in which it was stated:

"In the light of the testimony of Bruce Robinson, the acting director of the planning commission of El Dorado County, at the hearing of the petition herein, to the effect that district three in the western part of the county is growing faster than any other section and that the Tahoe section is over developed, I believe the board of supervisors was justified in adopting the recommendation of the redistricting committee that no changes be made at the present time in the boundary lines of the supervisorial districts.

"Therefore the petition for writ of mandate should be dismissed and the alternative writ discharged."

It appears to have been stipulated at the hearing that certain correspondence had been exchanged between petitioner and the board. This correspondence may be summarized as follows: On August 22, 1963, petitioner had written to the board relative to changing the boundaries of the several districts. On September 12, 1963, the board had answered, informing petitioner that a citizen's redistricting committee had

been appointed in January of 1962 to study changes of supervisorial boundaries and had been requested to make a written report of its recommendations to the board, all pursuant to section 25001 of the Government Code. The board had been awaiting the report of the county redistricting committee and had also been awaiting such action as might be taken by the Legislature with relation to changes in supervisorial district boundaries. On September 18, 1963, petitioner had replied to the board's letter, asserting that the report of the redistricting committee was long overdue and asserting that the board had not acted responsive to its duties within a reasonable time. On October 2, 1963, the board replied that they had received petitioner's letter and that the matter was presented to the board at a meeting held September 30; that in the meantime, the letter had been referred to the redistricting committee. On October 28 following, the board wrote to petitioner, enclosing the report of the redistricting committee relative to redistricting which had by that time been received; that therein the committee reported that an analysis of growth rates and population trends within the existing districts had been made and that due to population trends the districts would become more equal in population in the near future; that the committee had concluded the existing district boundaries better conform to the topography, geography, cohesiveness, contiguity, integrity, compactness of territory and particularly in communities of interest in the county than any proposed redistricting that had been studied by the committee; that the committee further felt that the existing inequality in population was not great enough to create any significant problems in the adequate representation of all of the people in the county on the board of supervisors. The report continued that the committee had decided there was no present need for changes in district boundaries and had recommended that none be made. On October 31 following, petitioner wrote to the board asking if the board had adopted the recommendation made by the committee. Under date of November 5 following, the petitioner received a letter from the board announcing that it had adopted the committee's recommendations and that there would be no redistricting at that time.

The correspondence referred to contained statements concerning the existing percentage of voters in each of the five districts and that this percentage was as follows: One district contained 43.14 per cent of all voters in the county, another

13.17 per cent, another 13.42 per cent, another 8.14 per cent, and the other 22.03 per cent. Although the stipulation referred to was to the effect that the correspondence had been exchanged, we are assuming that the stipulation embraced a stipulation of fact as to the percentages of voter registration in the existing districts. These percentages do show a considerable variation in registered voters and, inferentially, an existing inequality in population.

Findings of fact and conclusions of law were waived by the parties and the judgment recited that having heard the testimony, and having examined the evidence offered by the parties, the court adjudged and decreed that the writ of mandate be denied and the petition therefor be dismissed.

There has been neither augmentation of the record on appeal nor request therefor, and in view of legislation which has intervened between the date of the judgment, January 17, 1964, and the present time, this court is not inclined on its own motion to augment the record so as to bring before it the testimony of the witness upon whose testimony the superior court stated it had relied. Deciding the cause, therefore, upon the record presented, we find no error appearing on the face of the record, and we must presume that the oral evidence received by the trial court sustained its judgment. (*White* v. *Jones,* 136 Cal.App.2d 567, 571 [288 P.2d 913].)

Notwithstanding the marked differences in population of the several supervisorial districts in the county, this court knows that the population trends in El Dorado County are such that imbalances may possibly be corrected in the near future, and we cannot say as a matter of law that redistricting is presently required.

We hereinabove referred to the disinclination of this court to augment the record on its own motion so as to bring up the testimony referred to, due to legislative changes in the law that had intervened since the date of the decision under review. On April 27, 1964, the Governor signed Senate Bill No. 6 of the Legislature, enacting material changes in the statute law governing redistricting of supervisorial districts within counties. The legislation is now in force. Section 25001 of the Government Code, as amended, now reads as follows: ''Following each decennial federal census, and using the census as a basis, the board [board of supervisors] shall adjust the boundaries of any or all of the supervisorial districts of the county so that the districts shall be as nearly equal in population as may be, but in any case so that the population of

every district when added to the population of any other two districts equals at least 50 percent of the population of the county. In establishing the boundaries of the districts the board may give consideration to the following factors: (a) topography, (b) geography, (c) cohesiveness, contiguity, integrity, and compactness of territory, and (d) community of interests of the districts.''

Section 25001.1, added to the code, reads in part: ''The boundaries of the supervisorial districts shall be adjusted by the board between the first regular meeting of the board held in January 1965 and April 30, 1965, and thereafter before the first day of October of the year following the year in which each decennial federal census is taken. If the board fails to adjust the boundaries between the first regular meeting of the board held in January 1965 and April 30, 1965, a supervisorial redistricting commission shall do so before the first day of July of the year 1965. If the board fails to adjust the boundaries before the first day of October following the year in which any succeeding federal census is taken, a supervisorial redistricting commission shall do so before the 31st day of December of the same year. In either case the adjustment of the district boundaries shall be immediately effective the same as if the act of the supervisorial redistricting commission were an ordinance of the board, subject, however, to the same provisions of referendum as apply to ordinances of the board.''

Section 25001.2 was added to the code, and it reads as follows: ''The supervisorial redistricting commission shall be composed of the county assessor, the district attorney, and the county clerk if he is elected by the qualified electors of the county, or, if not, the county superintendent of schools if he is elected by the qualified electors of the county, or if not, the sheriff. The county clerk, superintendent of schools, or sheriff, whichever is a member of the commission, shall be chairman.''

Section 25001.4 was added to the code and reads as follows: ''Population figures to be used for the adjustment of boundaries to be accomplished between the first regular meeting of the board held in January, 1965 and April 30, 1956, shall be based on the 1960 federal census, or a later census of the county taken under the provisions of section 26203, or on the total number of registered voters of the county. In a county in which the population has increased by 20 percent

or more between April 1, 1960, and July 1, 1963, as reported by the State Department of Finance in the document entitled 'Population of California Counties, July 1, 1963,' population estimates may be used provided the board determines that the estimates will reflect the current population within the district boundaries more accurately than the 1960 census data. Any person claiming that the estimates of population used in the redistricting do not reflect the current population within the district boundaries more accurately than the 1960 census data, may commence an action in the superior court in declaratory relief to determine that fact. Such action shall be brought within 30 days after the adoption of the redistricting ordinance.''

This new legislation makes it mandatory that in every case the population of every supervisorial district within a county, when added to the population of any other two districts, equals at least 50 per cent of the population of the county. This requirement demonstrates that if the present apparent inequality in El Dorado County continues to exist into the near future, redistricting must be made by the board during the period intermediate its first meeting in January of 1965 and April 30, 1965. If this be not done, the matter passes to a statutorily designated redistricting commission whose conclusions will have the force and effect of an ordinance of the county. The standards set up by the new legislation are so much more definite than those previously existing that we cannot assume that the board will fail to comply. If it does, the matter passes into other hands. We think, therefore, that notwithstanding what a full record might show in the present appeal, this court should presently affirm the order appealed from. (See *Henderson* v. *Superior Court,* 61 Cal.2d 883 [37 Cal.Rptr. 438, 390 P.2d 206].)

The order is affirmed.

Pierce, P. J., concurred.

FRIEDMAN, J.—I concur in the result. Only the rub of time and new legislation, not the intrinsic or presumed correctness of the trial court judgment, justifies affirmance.

It is true, as the majority opinion points out, that petitioner has designated an appeal record consisting of little more than the judgment roll. Incorporated in the responsive pleading filed by El Dorado County, thus included in the judgment roll, was a tabulation showing the following dis-

tribution of registered voters among the five supervisorial districts of El Dorado County in December 1962:

| District Number | Registered Voters |
|---|---|
| 1 | 5,157 |
| 2 | 1,584 |
| 3 | 1,605 |
| 4 | 973 |
| 5 | 2,633 |

Percentagewise, this distribution is approximately as follows:

| District Number | Registration Percentage |
|---|---|
| 1 | 43.1 |
| 2 | 13.4 |
| 3 | 13.4 |
| 4 | 8.1 |
| 5 | 22.0 |

In the establishment of supervisor districts population, not equality of voter registrations, is the criterion. Experience tells us, however, that registered voter statistics supply a fairly adequate measure of population distribution. (See *Griffin* v. *Board of Supervisors*, 60 Cal.2d 318, 320 [33 Cal. Rptr. 101, 384 P.2d 421].[1] Thus, on the record before us, the most populous district of El Dorado County contains more than five times the inhabitants of the least populous, more than three times the number of the next two and twice that of the remaining district. Only one district hovers in the neighborhood of the ideal arithmetical mean. Supervisors of the three least populous districts, representing about 35 per cent of the county's population, can exercise controlling voting power on the board. Two supervisors, representing 21 per cent of the population, can block any measure requiring a two-thirds vote. A voter in District Number 1 has a still small voice in county government, his counterpart in District Number 4 an effective, powerful voice. On the face of the matter, the maldistribution of population causes a serious dilution of suffrage, palpable discrimination and a substantial denial of equal protection of the laws.

In fairness to respondents, it should be observed that the situation in El Dorado County has been paralleled in a number of other California counties. Availability of mandamus pro-

---

[1]The second *Griffin* case, 60 Cal.2d 751, at p. 755 [36 Cal.Rptr. 616, 388 P.2d 888], shows us that the measure may become inaccurate in the presence of a large military population. There is no evidence of a significant military population in the case at hand.

ceedings to compel supervisorial reapportionment was revealed in *Griffin* v. *Board of Supervisors, supra,* 60 Cal.2d 318, in which the State Supreme Court ordered rearrangement of malformed districts in Monterey County. That decision was filed on August 20, 1963. Later, in February 1964, the court approved a new districting plan for Monterey County, in which certain local conditions justified deviations from the mathematical norm. (*Griffin* v. *Board of Supervisors, supra* (fn. 1), 60 Cal.2d 751.[2])

As a result of the Monterey County decisions, several superior courts within the Third Appellate District ordered county redistricting in time for the June primary elections of 1964. For all we know, other counties may have redistricted without judicial compulsion. Petitioner made his initial representations to the El Dorado County Board of Supervisors on August 22, 1963, two days after the first *Griffin* decision. The present action was heard by the trial court in December 1963, and judgment for the respondent was entered in January 1964. Had relief been granted, the serious denial of political equality could have been remedied in time for the primary and general elections of 1964. Denial of relief prolonged the inequity at least through the elections of 1966, possibly through the elections of 1968. Part of the board is elected in each even-numbered year and takes office the following January. (Gov. Code, §§ 24202, 25000.) If fair redistricting in El Dorado County were to take place immediately, a five-member board elected from revised districts would not be in office until January 1969. In appraising the judgment, we must view the matter from the same standpoint as did the trial court, that is, with reference to the 1964 elections.

Even on a judgment roll appeal, the opinion of the trial judge is an appropriate part of the record. (Cal. Rules of

[2]Judicial and statutory sanctions for deviations from a strict population standard must now be reappraised in the light of the Fourteenth Amendment concepts described in the so-called ''Senate reapportionment'' case. (*Reynolds* v. *Sims,* 377 U.S. 533 [84 S.Ct. 1362, 12 L.Ed.2d 506, dated June 15, 1964].) These concepts demand that divergences be based upon ''legitimate considerations incident to the effectuation of a rational . . . [public] policy, . . .'' (377 U.S. at p. 579 [84 S.Ct. at p. 1391, 12 L.Ed.2d at p. 537].) It seems logical to assume that equal protection concepts governing formation of state legislative districts are, in a general way, no less applicable to county legislative districts. As noted in *Blotter* v. *Farrell,* 42 Cal.2d 804, 811 [270 P.2d 481] (paraphrasing 19 Ops. Cal. Atty. Gen. 94, 97), the problem of population equality ''exists whenever divisions of territory and population are made for the purpose of electing popular representatives.''

Court, rule 5(a).) That opinion describes two factors which entered into the judgment. The first was the testimony of the county planning director, who stated that District Number 3 (the western part of the county, adjoining Sacramento County) was growing faster than any other section and that the Tahoe area (in District Number 5) was "over developed." The second factor was the report of a citizens' advisory committee which concluded that population inequalities created no significant problem of adequate representation and that the existing districts conformed to factors of topography, geography, cohesiveness, contiguity, integrity, compactness and community of interest better than did some other proposal.

Both before and since its 1964 amendment, Government Code section 25001 has pointed to approximate equality of population as the primary standard of county redistricting. Other factors, such as topography, cohesiveness, and community of interest were and are secondary factors. In August 1963 (several months before the El Dorado citizens' committee filed its report and four months before the trial court hearing in this case) the State Supreme Court had said that the latter factors had only a "subsidiary effect" and could not warrant large deviations from equality of population. (*Griffin* v. *Board of Supervisors, supra,* 60 Cal.2d at p. 321.) The Supreme Court was only echoing the obvious import of the statute. Refusal to redistrict in El Dorado County rested upon an inversion of these standards. The last of these standards became the first, and the first among them became the last. The record before us, while auguring better things to come, gives no hint of massive population shifts which might have restored constitutional and statutory integrity in time for the 1964 or even the 1966 elections. There is no mention of *existing* topographic, cultural and governmental considerations which might arguably justify existing swings from the ideal of approximate equality. (See *Reynolds* v. *Sims, supra,* 377 U.S. at pp. 579-581 [84 S.Ct. at pp. 1390-1392, 12 L.Ed.2d at pp. 537-539]; *Griffin* v. *Board of Supervisors, supra,* 60 Cal.2d at pp. 754-755.) Indeed, it is difficult to conceive any legitimate considerations to justify the radical deviations present in El Dorado County.

In counterbalance to the mathematical facts conceded by the county's pleading, the oral testimony described in the record had little relevance and less weight. Consequently, we should not presume that this testimony sustains or justifies the judgment. To the contrary, where error appears on the

face of the judgment roll, we presume that the record includes all matters material to a determination of the appeal. (Cal. Rules of Court, rule 52.) The county's own statistics demonstrated a palpable illegality in the conformation of supervisorial districts, which called for judicial relief.

In the absence of changed circumstances pending appeal, it would have been appropriate to reverse the judgment and remand this proceeding to the superior court with directions to retain jurisdiction to ensure compliance with the law within a reasonable time. That action would have rested on the premise that justice delayed is better than justice denied. Circumstances have now altered. While this appeal was pending, the Legislature enacted comprehensive legislation on the subject of supervisorial districting. (Gov. Code, §§ 25001-25002 (Stats., 1st Ex. Sess. 1964, ch. 40).) Like other county boards, the supervisors of El Dorado County are under a statutory mandate to adjust district boundaries by April 30, 1965, and if they fail to do so, a redistricting commission will take over. Exercising the discretion traditional in mandamus proceedings, we may now safely say that there is no point in superimposing a judicial mandate on top of the statutory mandate. (See *Henderson* v. *Superior Court*, 61 Cal.2d 883 [37 Cal.Rptr. 438, 390 P.2d 206].) The law being fully revealed, we may for present purposes assume that the supervisors of El Dorado County will follow it.